IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Marion Bowman Jr.,<br><br>PETITIONER<br><br>v.<br><br>Bryan P. Stirling, *Commissioner, South Carolina Department of Corrections*; Willie D. Davis, *Warden, Kirkland Correctional Institution*,<br><br>RESPONDENTS | Case No. 9:18-cv-00287-TLW<br><br><br><br>**Order** |

This is a capital habeas corpus action brought pursuant to 28 U.S.C. § 2254 by Petitioner Marion Bowman Jr. against Respondents Bryan P. Stirling and Willie D. Davis (collectively, the State). For the reasons set forth below, the Court grants the State's motion for summary judgment and denies Bowman's habeas petition.

# I.    Factual and Procedural History

## A.    Trial and Sentencing

The South Carolina Supreme Court summarized the facts of Bowman's case as follows:

> On February 17, 2001, Kandee Martin's [] body was found in the trunk of her burned car. She had been shot to death before being placed in the trunk.
>
> The previous day, several people gathered at Hank Koger's house to socialize and drink alcohol. [Bowman], who was wearing black pants, arrived at Koger's house around 11:00 a.m. that day. He subsequently left to purchase meat. When [Bowman] returned, he became upset

because his gun had been moved. He accused James Tywan Gadson []
of taking the gun out of the trash barrel located on Koger's property.
Hiram Johnson intervened and told [Bowman] he had moved the gun.
The gun was a .380 caliber pistol that [Bowman] had purchased a few
weeks before in the presence of Gadson and Travis Felder. After
retrieving his gun, [Bowman] left Koger's house.

Later that afternoon, [Bowman] was riding in the car of his sister,
Yolanda Bowman, with another woman, Katrina West. [Bowman],
who had a gun in his back pocket, was sitting in the back seat. He
instructed Yolanda to park beside [Martin's] car. At the time, [Martin]
was speaking to a man. [Bowman] tried to get [Martin's] attention,
but she indicated to him that he should wait a moment. The man,
Yolanda, and Katrina testified as to what [Bowman] said next. The
man stated that [Bowman] said, "Fuck waiting a minute. I'm about to
kill this bitch." Yolanda stated that [Bowman] said, "Fuck it, that
bitch. That bitch be dead by dark." Katrina stated that [Bowman]
said, "Fuck that ride. That bitch be dead by dark fall." After
[Bowman's] comments, Yolanda drove away and [Bowman] informed
her [Martin] owed him money.

Around 7:30 p.m. that evening, [] Gadson saw [Bowman] riding with
[Martin] in her car. They stopped and [Bowman] told Gadson to get in.
Gadson had been drinking alcohol since 1:00 and was "feeling in good
shape." [Martin] stopped for gas and they drove off without paying.
[Bowman] allegedly instructed [Martin] where to drive and instructed
her to stop on Nursery Road. Gadson and [Bowman] then exited the
vehicle and walked down the road while [Martin] remained in the car.
[Bowman] told Gadson he was going to kill [Martin] because she had
on a wire. [Martin] then came down the road, grabbed [Bowman's]
arm and stated she was scared. At this point, a car drove by and they
all jumped into the woods. Then, [Martin] started walking to the car
with [Bowman] following her. [Bowman] allegedly shot his gun three
times. Gadson stated [Martin] ran toward him and then stopped and
faced [Bowman] and told him to please not shoot her anymore because
she had a child to take care of. Gadson stated [Bowman] shot two
more times. [Martin] fell to the ground and [Bowman] dragged her
body into the woods. Gadson stated he jumped into the car.

Afterwards, [Bowman] and Gadson parked [Martin's] car and later
retrieved Yolanda's car. They then went to a store to purchase beer
and went back to Koger's house around 8:00 p.m. Later, Gadson
stayed at Koger's house and [Bowman] left. Around 11:30 p.m.,
[Bowman] and Hiram Johnson approached James Gadson, Gadson's
father. [Bowman] gave him money to buy four pairs of gloves.

[Bowman], Gadson, Hiram Johnson, and Darian Williams, then drove to Murray's Club in [Martin's] car. [Bowman] handed out the gloves for the occupants to wear and stated he had stolen the car. They reached the club around midnight. Once at the club, [Bowman] tried to sell [Martin's] car. [Bowman], according to Hiram Johnson, said, "I killed Kandee, heh, heh, heh." [Bowman] had a gun with him while at the club. They left the club an hour or two after arriving there.

Three people, Carolyn Brown, Valorna Smith, and [] Felder, left the club together. They stopped by a gas station about 3:00 a.m. before proceeding to Valorna's home. Not long after they were there, [Bowman] knocked on the door and asked for [Felder]. [Felder] left and came back after a few minutes. He seemed normal upon his return.

[Felder] testified [Bowman], who was wearing black jeans at the time, stated he needed [Felder's] help to park a car which turned out to be [Martin's] car. [Felder] followed [Bowman] to Nursery Road. [Bowman] parked the car, went into the woods and pulled [Martin's] body out by her feet. [Bowman] then put her body in the trunk. While putting her body in the trunk, [Felder] saw a gun tucked into appellant's waist. [Bowman] allegedly told [Felder], "you didn't think I did it, did you?" [Felder] testified [Bowman] also stated, "I killed Kandee Martin." [Bowman] lit the car on fire. [Felder] then took [Bowman] to his home and went back to Valorna's house.

A resident of Nursery Road who had previously heard gunshots was awakened late in the night by a loud noise. He investigated and discovered a car on fire. The fire was reported at 3:54 a.m. There were .380 Winchester cartridge casings found not far from the scene. The casings, a blood stain, and a shoe were located with the help of a man who had driven by and seen [Martin's] car stopped on the road around 8:00 p.m. the previous evening.

The next day, police arrested [Bowman] at his wife's house and seized his black pants. His wife testified he had been wearing the pants when he arrived at the house. They found a wristwatch belonging to [Martin] in [Bowman's] pants.

After the police left, [Bowman's] wife [] found [Bowman's] gun in a chair in her home. She allegedly gave the gun to [Bowman's] father. The next day, [Bowman's] father, Yolanda, and [Bowman's] other sister, Kendra, took the gun and dropped it off a bridge into the Edisto River. It was later retrieved from the Edisto River and determined to be the gun that was used in the murder.

The arson investigator testified there was the presence of a heavy petroleum product on [Bowman's] jeans, but the product was not gasoline. The items found in the car had gasoline on them indicating that was the product used to start the fire.

While the following evidence did not come out during the guilt phase, during the sentencing phase, a video was introduced during [] Felder's testimony. The video showed [Felder] purchasing gasoline in a gasoline can at about 3:14 a.m. [Bowman] was not with him on the video. [Felder] stated [Bowman] gave him the can for the gas and told him he needed $2–3 worth. When [Bowman] set fire to [Martin's] car, he retrieved the gas can from [Felder's] car.

*State v. Bowman (Bowman I)*, 623 S.E.2d 378, 380–82 (S.C. 2005) (footnotes omitted).

Bowman was indicted in June 2001 for murder and arson, third degree. He was represented by Norbert Cummings Jr. and Marva Hardee-Thomas in a jury trial that began on May 17, 2002. The jury returned a guilty verdict on both counts.

During the trial's sentencing phase, after hearing evidence and argument, the jury returned a recommendation of death on the murder conviction, finding as aggravating circumstances that the murder was committed while in the commission of kidnapping and while in the commission of larceny with the use of a deadly weapon. The presiding judge sentenced Bowman to death on the murder conviction and ten years on the arson conviction.

## B.     Direct Appeal

Bowman timely appealed and was represented on appeal by Robert Dudek, Assistant Appellate Defender with the South Carolina Office of Appellate Defense. On appeal, he raised issues relating to the trial court's jury instructions, evidentiary

rulings, denial of a mistrial, jurisdiction, and denial of a suppression motion. The South Carolina Supreme Court affirmed Bowman's conviction and sentence. *Bowman*, 623 S.E.2d at 387. He then submitted a petition for rehearing, which was denied.

After Bowman's petition for rehearing was denied, he filed a petition for a writ of certiorari from the United States Supreme Court, which was denied. *Bowman v. South Carolina*, 547 U.S. 1195 (2006).

## C.    PCR Action

While awaiting the United States Supreme Court's decision on his petition for a writ of certiorari, Bowman submitted an application for post-conviction relief (PCR). He was initially represented in the PCR action by James Brown Jr. and Charlie Johnson Jr., though Johnson was later replaced by John Sinclaire III. PCR counsel eventually submitted a fourth amended application raising numerous grounds for relief. After briefing and an evidentiary hearing, the PCR court denied his petition. He then filed a motion to alter or amend, which was also denied.

## D.    PCR Appeal

On appeal to the South Carolina Supreme Court, Bowman was represented by Robert Dudek, Chief Appellate Defender, and David Alexander, Appellate Defender, both with the South Carolina Commission on Indigent Defense, as well as Michael Anzelmo with Nelson Mullins Riley & Scarborough. Bowman's amended petition for a writ of certiorari raised the following issues:

1.    Whether trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth. and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment of Taiwan Gadson and by failing to impeach the testimony of Taiwan Gadson in any meaningful way, including, but not limited to, the fact that the state threatened Gadson with the death penalty in his plea agreement, how Gadson's prior inconsistent statements showed that his story changed, and the fact Gadson had access to the murder weapon?

2.    Whether trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment of Travis Felder and by failing to impeach the testimony of Travis Felder in any meaningful way, including impeaching Felder with a videotape that would have shown Felder lied to the jury about buying the gas to burn the decedent's car, impeaching Felder on bias with his original charges, and impeaching Felder with his prior inconsistent statements?

3.    Whether trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment Hiram Johnson and by failing to impeach the testimony of Hiram Johnson by cross-examining Johnson on his prior inconsistent statement which, critically, did not include his allegation at trial that petitioner confessed to the murder?

4.    Whether petitioner is entitled to a new trial because the state withheld information necessary for impeachment and necessary for defense in violation of petitioner's due process rights under the Fourteenth Amendment and under the rules of discovery, those items being a memorandum of a law enforcement interview with Ricky Davis who heard Gadson confess to the murder, Gadson' s mental health evaluation, and the fact that Hiram Johnson had unindicted pending charges at the time of his testimony?

5.    Whether trial counsel rendered ineffective assistance of counsel because counsel had a conflict of interest between two of her clients—Petitioner Bowman and Ricky Davis—that caused counsel to fail to call Ricky Davis as a witness, despite Davis'

statement that exculpated Petitioner Bowman and established Gadson shot the victim?

6. Whether defense counsel was ineffective for failing to object to the solicitor's examination of James Aiken regarding favorable prison conditions and recreational facilities available to inmates since this Court had long ago in *State v. Plath*, 281 S.C. 1, 313 S.E.2d 619 (1984), held such evidence was impermissible because it did not relate to the character of the defendant or the nature of his crime. This evidence was highly prejudicial in the eyes of the jury, and the failure to object to it properly at trial also barred consideration of this winning issue on petitioner's direct appeal?

7. Whether petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under state law were violated because the trial judge failed to properly consider his application as evidenced by the PCR court's wholesale adoption of the state's proposed order?

ECF No. 12-17 at 6–8.

The South Carolina Supreme Court granted the petition as to Question 6 and denied it as to the rest. After briefing and argument, the court affirmed the PCR court. *Bowman v. State (Bowman II)*, 809 S.E.2d 232, 246 (S.C. 2018).

### E. Federal Habeas Action

Bowman commenced this action by filing a motion for a stay of execution and a motion to appoint counsel. ECF No. 1. The Court stayed his execution pending appointment of counsel. ECF No. 6. Bowman's appointed counsel then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 17. The Court stayed his execution pending resolution of his habeas petition. ECF No. 24. He later filed an amended petition, which raises the following issues:

**Ground 1:**    Trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment of Taiwan Gadson and by failing to impeach the testimony of Taiwan Gadson in any meaningful way, including, but not limited to, the fact that the state threatened Gadson with the death penalty in his plea agreement, how Gadson's prior inconsistent statements showed that his story changed, and the fact Gadson had access to the murder weapon.

**Ground 2:**    Trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment of Travis Felder and by failing to impeach the testimony of Travis Felder in any meaningful way, including impeaching Felder with a videotape that would have shown Felder lied to the jury about buying the gas to burn the decedent's car, impeaching Felder on bias with his original charges, and impeaching Felder with his prior inconsistent statements.

**Ground 3:**    Trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment Hiram Johnson and by failing to impeach the testimony of Hiram Johnson by cross-examining Johnson on his prior inconsistent statement which, critically, did not include his allegation at trial that petitioner confessed to the murder.

**Ground 4:**    Petitioner is entitled to a new trial because the state withheld information necessary for impeachment and necessary for defense in violation of Petitioner's due process rights under the Fourteenth Amendment and under the rules of discovery, those items being a memorandum of a law enforcement interview with Ricky Davis who heard Gadson confess to the murder, Gadson's mental health evaluation, and the fact that Hiram Johnson had unindicted pending charges at the time of his testimony.

**Ground 5:**   Trial counsel rendered ineffective assistance of counsel because counsel had a conflict of interest between two of her clients—Petitioner Bowman and Ricky Davis—that caused counsel to fail to call Ricky Davis as a witness, despite Davis' statement that exculpated Petitioner Bowman and established Gadson shot the victim.

**Ground 6:**   Defense counsel was ineffective for failing to object to the solicitor's examination of James Aiken regarding favorable prison conditions and recreational facilities available to inmates since this evidence interjected an arbitrary factor into Petitioner's trial and violated his right to due process.

**Ground 8:**   The trial court erred by refusing to instruct the jury on the statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, since there was expert testimony of Petitioner's substance abuse problem, and evidence the parties were drinking alcohol throughout the day. The South Carolina Supreme Court's opinion, holding there was no evidence that Petitioner was intoxicated on the day of the murder, is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**Ground 10:**   The court erred by refusing to grant a mistrial where the solicitor attempted to question James Aiken about the possibility of escape, since the solicitor injected an improper consideration and an arbitrary factor into the sentencing phase. The jury's attention is properly focused on the penalties of death and life without parole, and not speculative matters beyond Petitioner's control. Defense counsel correctly argued that the judge could not remove the taint through a curative instruction once escape was raised by the state as an issue.

**Ground 11:**   Trial counsel rendered ineffective assistance of counsel for failing to object to the Solicitor's arguing to discount Petitioner's mitigation because there was no "nexus" between Petitioner's proffered mitigation and the crime.

**Ground 12:**   Trial counsel rendered ineffective assistance of counsel by failing to call a number of witnesses who were available to

> trial counsel, and who would have provided the jury with highly mitigating evidence of Petitioner's dysfunctional childhood that the jury did not otherwise here.

ECF No. 36 at 7–8, 26, 41–42, 46, 58, 65, 75, 78, 83, 85.[1]  The State filed a return to the amended petition and a motion for summary judgment.  ECF Nos. 56, 57.  Bowman filed a response in opposition to the summary judgment motion, ECF No. 70, and the State filed a reply, ECF No. 74.

With briefing complete, the magistrate judge issued a Report and Recommendation (Report), in which he recommended granting the State's summary judgment motion and denying the habeas petition.  ECF No. 75.  Bowman filed objections to the Report, ECF No. 81, and the State filed a reply to those objections, ECF No. 82.

This matter is now ripe for decision.

## II.    Standards of Review

### A.    Report and Recommendation

The magistrate judge issued his Report in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2)(c) (D.S.C.).  The Report is a recommendation to the Court and has no presumptive weight.  The responsibility to make a final determination rests with the Court.  *See Mathews v. Weber*, 423 U.S.

---

[1] The petition does not include a Ground 7 or Ground 9, but the Court, like the magistrate judge, has maintained the numbering used in the petition.  However, the Court, again like the magistrate judge, has renumbered the two additional grounds, which are found in his petition under the heading of "Unexhausted Claims," as Grounds 11 and 12.

261, 270–71 (1976).  The Court conducts a *de novo* determination of any portion of the Report to which a specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the magistrate judge's recommendation, or may recommit the matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).  In the absence of an objection, the Court is not required to give any explanation for adopting the recommendation.  *See Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983).  The district court reviewed the cited transcripts, and references to transcripts included  in the Report in evaluating the issues raised and addressed in this order.  The Court also notes that the Report is 121 pages long, with significant detailed discussion of the positions taken by counsel for the parties, the PCR court's analysis, caselaw, and the many issues raised.

## B.   Summary Judgment

Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

The party seeking summary judgment bears the initial burden of demonstrating to the Court that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this

threshold showing, in order to survive summary judgment, the nonmoving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *See id.* at 324.

## C. Habeas Corpus Review

### 1. *Deference to state courts*

Any claim in a § 2254 petition that was adjudicated on the merits in a state court proceeding may not be granted unless the state court's adjudication of the claim

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

To meet this standard, the state court must have "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decide[d] a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "[A] federal habeas court may overturn a state court's application of clearly established federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013). "[A] federal court hearing a § 2254 petition may not substitute 'its independent

judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Tyler v. Hooks*, 945 F.3d 159, 166 (4th Cir. 2019) (quoting *Williams*, 529 U.S. at 411). This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted). "The Supreme Court has 'often emphasized that this standard is difficult to meet because it was meant to be.'" *Tyler*, 945 F.3d at 167 (quoting *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018)).

## 2.    *Ineffective assistance of counsel*

Criminal defendants have a constitutional right to the assistance of counsel. U.S. Const. amend. VI. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted).

To prevail on an ineffective assistance claim, a petitioner must show that (1) counsel's acts or omissions fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See id.* at 687–88, 694. Failure of proof on either prong ends the matter. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004). There is "a strong presumption that counsel's conduct falls within the wide range of professional assistance," and a petitioner has the burden of overcoming this presumption. *Strickland*, 466 U.S. at 689. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of

materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Strickland*, 466 U.S. at 690).  An ineffective assistance of counsel allegation requires the submission of specific facts in support of the claim.  *See United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000).

When *Strickland* is applied in the federal habeas context, it is an even taller hurdle to overcome.  "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*  Thus, relief would be appropriate only if the petitioner demonstrates that there is no reasonable argument that counsel satisfied *Strickland*.

### 3.    *Exhaustion and procedural default*

A habeas petitioner may not obtain relief in federal court unless he has exhausted his state court remedies.  28 U.S.C. § 2254(b)(1)(A).  "To satisfy the exhaustion requirement, a habeas petitioner must fairly present his claim to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997),

*abrogated on other grounds by Miller-El v. Dretke*, 545 U.S. 231 (2005). "To exhaust a claim, the petitioner must present the state court with 'both the operative facts and the controlling legal principles.'" *Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) (quoting *Winston v. Kelly*, 592 F.3d 535, 549 (4th Cir. 2010)).

A petitioner's failure to raise in state court a claim asserted in a § 2254 petition "implicates the requirements in habeas of exhaustion and procedural default." *Gray v. Netherland*, 518 U.S. 152, 161 (1996). "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance," and has therefore procedurally defaulted those claims. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray*, 518 U.S. at 162.

In general, a federal court will not entertain a procedurally defaulted claim as long as the state's procedural requirement barring the court's review is adequate to support the judgment and independence of federal law. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012). However, "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* at 10.

A federal habeas petitioner cannot claim ineffective assistance of counsel in state post-conviction proceedings to establish cause for default because there is no constitutional right to counsel in state post-conviction proceedings. *See Coleman*, 501 U.S. at 752. However, the Supreme Court has recognized a "narrow exception" to *Coleman*, specifically that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. The Fourth Circuit has summarized the *Martinez* exception as follows:

> [A] federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consists of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

*Fowler v. Joyner*, 753 F.3d 446, 461 (4th Cir. 2014) (cleaned up) (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)). Essentially, if initial-review collateral counsel was constitutionally ineffective in failing to raise the constitutional ineffectiveness of trial counsel, collateral counsel's ineffectiveness may excuse the petitioner's procedural default of a substantial claim of trial counsel's ineffectiveness.

## III. Discussion

The Court will address each ground for relief that Bowman raised in his habeas petition.

## A.      Ground 1 – Ineffective assistance re: Taiwan Gadson

Ground 1 of the petition is as follows:

Trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment of Taiwan Gadson and by failing to impeach the testimony of Taiwan Gadson in any meaningful way, including, but not limited to, the fact that the state threatened Gadson with the death penalty in his plea agreement, how Gadson's prior inconsistent statements showed that his story changed, and the fact Gadson had access to the murder weapon.

ECF No. 36 at 7–8.

### 1.      *Bowman's claims*

Gadson was a significant witness in the State's case.  He was with Bowman at various times before, during, and after the murder.  He saw Bowman with a gun prior to the murder.  He was the only witness who testified as to how the murder occurred.  He rode in Martin's car with Bowman after the murder.  At trial, he testified that he had been charged with Martin's murder, but that he had entered into an agreement with the State in exchange for his testimony at Bowman's trial. The agreement called for the murder charge to be dropped and for him to plead guilty to charges of accessory after the fact of murder and misprision of a felony, with a negotiated sentence of twenty years imprisonment.

Bowman asserts that counsel was ineffective regarding Gadson by failing to question him about his own exposure to the death penalty, by failing to confront him with evidence that he fired the murder weapon prior to the day of the murder,

and by failing to press him on inconsistencies in various statements he made to police regarding the murder.

As to Gadson's exposure to the death penalty, Bowman argues that counsel was ineffective for failing to specifically inform the jury that Gadson made a plea deal with the State to avoid a capital murder charge. This argument is primarily based on his plea agreement, which provides that if he did not cooperate against Bowman, then the State could move to vacate Gadson's plea and could "reinstate the murder charge and seek the death penalty against [him]." R. p. 1946 (ECF No. 11-23 at 196). Bowman argues that counsel was ineffective in "fail[ing] to emphasize that Gadson was testifying to avoid the death penalty." ECF No. 36 at 14.

As to Gadson's previous use of the murder weapon, Bowman argues that counsel was ineffective in failing to present evidence indicating that Gadson had fired the murder weapon about two weeks before the murder.

As to Gadson's inconsistencies, Bowman argues that counsel was ineffective in failing to cross-examine Gadson regarding inconsistencies in several statements he made to police regarding the murder.

## 2. *PCR order*

Importantly, regarding Bowman's claim of ineffective assistance regarding Gadson's death penalty exposure, the PCR court rejected that argument because "[Bowman's] allegation that Gadson expressly bargained to avoid a death sentence is not supported by the record." R. p. 9835 (ECF No. 11-27 at 65). Specifically, the

PCR court concluded that he did not bargain to avoid the death penalty, as the State never served him with a death notice. *Id.* The PCR court also determined that Bowman failed to establish prejudice based in part on its conclusion that Gadson credibly testified at the PCR hearing that he thought he was avoiding a potential life sentence, not a death sentence. *See id.* at 9836 (ECF No. 11-27 at 66).

Regarding Bowman's claim of ineffective assistance regarding evidence that Gadson had previously fired the murder weapon, the PCR court rejected that argument because Bowman had given Gadson the gun to fire, and counsel was not deficient in declining to introduce evidence that would indicate to the jury that Bowman had control of the murder weapon shortly before the murder. *See id.* at 9845 (ECF No. 11-27 at 75).

Regarding Bowman's claim of ineffective assistance regarding inconsistencies in Gadson's prior statements, the PCR court did not rule on this issue.

### 3. *Report*

In the Report, the magistrate judge concluded that the PCR court did not unreasonably apply federal law on either *Strickland* prong regarding Gadson's death penalty exposure. In particular, the magistrate judge noted that the PCR court evaluated the claim as "presented by PCR counsel—that Gadson expressly bargained to avoid a potential death sentence and that trial counsel should have pointed that out during cross-examination," ECF No. 75 at 20, not the slightly different claim asserted now—that Gadson should have been impeached "with the fact that he faced the death penalty," ECF No. 36 at 20. The magistrate judge also

noted that there was testimony before the jury that Gadson agreed to a twenty-year sentence on two lesser charges instead of facing a murder charge, and that counsel did ask the jury during closing to consider Gadson's bias as a result of the plea agreement. Finally, the magistrate judge noted the PCR court's determination that Gadson credibly testified at the PCR hearing that he thought he was avoiding a potential life sentence, not a death sentence, by entering into the plea agreement.

Regarding Gadson's prior use of the murder weapon, the magistrate judge concluded that the PCR court did not unreasonably apply federal law when it concluded that counsel was not ineffective in declining to pursue that line of questioning. The magistrate judge further concluded that the PCR court did not unreasonably apply federal law in determining that Bowman was not prejudiced by counsel's decision.

Regarding inconsistencies in Gadson's prior statements, the magistrate judge concluded that this argument was not properly raised and preserved in Bowman's state court proceedings, so it was procedurally barred. To the extent that he is seeking to bring this claim under *Martinez*, the magistrate judge also concluded that Bowman did not meet his burden of proving cause and prejudice in order to overcome the procedural default.

### 4. *Objections*

In Bowman's objections, he argues that counsel should have cross-examined Gadson about the provision in the plea agreement that provided that if he did not cooperate, the State could reinstate the murder charge and pursue the death

penalty. Bowman says that it should have been up to the jury to determine whether Gadson believed he was avoiding the death penalty by entering into the plea agreement. Bowman also argues that "[t]estimony that Gadson pled guilty to a lesser charge does not convey the magnitude of the incentive created by the possibility of avoiding a death sentence." ECF No. 81 at 3.

As to Gadson's prior use of the murder weapon, Bowman objects that counsel did not, in fact, have any reason not to question Gadson about his access to and use of the murder weapon prior to trial in light of other witnesses tying the gun to Bowman.

Bowman did not object to the magistrate judge's conclusion that his claim regarding Gadson's prior inconsistencies was procedurally defaulted.

## 5. *Analysis*

At the outset, the Court notes the deferential standard of review in this matter as set forth in the caselaw. The question is not whether counsel could have or should have more vigorously or thoroughly cross-examined Gadson. Instead, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" by cross-examining Gadson the way that they did. *Harrington*, 562 U.S. at 105. The Court answers that question in the affirmative.

Regarding Gadson's plea agreement, as the magistrate judge recognized, the jury was informed that Gadson received the benefit of a plea agreement to twenty years as a result of his cooperation and counsel addressed this potential source of

bias in his closing argument. Hence, it is clear that the jury knew that Gadson was testifying in light of a plea offer and possible lessened sentence. Additionally, the PCR court made the credibility determination that Gadson did not think he was avoiding a death sentence, and that credibility determination is entitled to substantial deference by this Court. *See* 28 U.S.C. § 2254(e)(1); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). The fact that counsel could have explored this topic more specifically as asserted does not mean that the decision not to focus on it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Furthermore, Bowman was not prejudiced by counsel's failure to cross-examine Gadson about the plea deal because, based on the PCR court's factual determination, he would have testified that he thought he was avoiding a potential life sentence, not a death sentence. This finding by the PCR court undermines the strength of Bowman's argument.

Regarding Gadson's prior use of the murder weapon, counsel testified at the PCR hearing that he did not want to invite evidence tying the murder weapon to Bowman. Bowman's response that there was other evidence in the record tying him to the gun is merely an indication that counsel could have pursued a different strategy. But that response does not overcome the presumption that this tactical decision "might be considered sound strategy." *Strickland*, 466 U.S. at 689 (citation omitted). As the PCR court determined, putting the gun in Gadson's hand for a

brief period of time two weeks prior to the murder would have had minimal benefit, as he only had the gun because Bowman gave it to him.

Regarding Gadson's inconsistent statements, the Court concludes that this claim is procedurally defaulted for the reasons set forth by the magistrate judge and Bowman did not meet his burden of proving cause and prejudice in order to overcome the procedural default.[2]

For these reasons, Bowman has failed to establish that the PCR court's denial of his claims in Ground 1 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 1.

## B.    Ground 2 – Ineffective assistance re: Travis Felder

Ground 2 of the petition is as follows:

Trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment of Travis Felder and by failing to impeach the testimony of Travis Felder in any meaningful way, including impeaching Felder with a videotape that would have shown Felder lied to the jury about buying the gas to burn the decedent's car, impeaching Felder on bias with his original charges, and impeaching Felder with his prior inconsistent statements.

ECF No. 36 at 26.

---

[2] As noted above, Bowman did not object to the magistrate judge's conclusions on this issue.

### 1. *Bowman's claims*

Bowman asserts that counsel was ineffective regarding Felder by failing to question him about him purchasing the gasoline that was used to burn Martin's car, about his original charges, and about his inconsistent statements.

Regarding Felder's gasoline purchase, Bowman argues that counsel was ineffective in not questioning Felder during the guilt phase of the trial about his purchase of the gasoline that was used to burn Martin's car. Bowman claims that leaving this out gave the jury the false impression that he acted alone in Martin's murder and that if the jury knew that Felder was involved in the crime, the outcome of the trial likely would have been different.

Regarding Felder's original charges, Bowman argues that counsel was ineffective in failing to impeach Felder regarding his original charge of accessory to murder / arson. After he testified at Bowman's trial, Felder was allowed to plead to accessory after the fact of arson, for which he received a sentence of three years imprisonment suspended to three years probation.

Lastly, Bowman argues that counsel was ineffective in failing to impeach Felder regarding prior inconsistent statements that he had given to police, specifically a proffer letter written by his attorney and a statement given during a polygraph examination.

## 2. *PCR order*

Regarding Bowman's claim of ineffective assistance about Felder's gasoline purchase, the PCR court rejected that argument, crediting counsel's explanation that "he did not want it in because he felt it would corroborate [Bowman's] involvement in the plan to burn the car." R. p. 9861 (ECF No. 11-27 at 91). The PCR court also noted that the evidence was eventually introduced during the sentencing phase, but that this "was done at [Bowman's] insistence and was not in line with [counsel's] strategy." *Id.* When Felder testified about this incident during sentencing, he said that he purchased the gasoline at Bowman's direction and that Bowman provided the gasoline jug. *Id.* at 9861–62 (ECF No. 11-27 at 91–92). Thus, the PCR court concluded that counsel had "a valid, reasonable strategic reason" for not presenting this evidence of the purchase of gasoline by Felder for Bowman during the guilt phase and therefore denied the claim. *Id.* at 9862 (ECF No. 11-27 at 92). The PCR court also concluded that Bowman failed to establish prejudice because Felder's omission did not indicate that he was involved in Martin's murder, because cross-examination on this issue would not have exculpated Bowman from being a participant in the arson, and because there was overwhelming evidence of his guilt of both the murder and the arson. *Id.*

Regarding Felder's original charges, the PCR court concluded that "there is no evidence that supports the implication that the accessory before the fact to the murder charge was 'reduced' to accessory after the fact as a result of Felder's cooperation." *Id.* at 9859 (ECF No. 11-27 at 89). The PCR court also determined

that counsel had a strategic reason for not discussing Felder's initial charges: that his original charges were based on statements that Bowman gave to police, which could be used to further the theme that he tried to deflect blame by implicating others. *Id.* at 9860 (ECF No. 11-27 at 90). As to prejudice, the PCR court determined that there was no prejudice in light of the minimal benefit to be gained and the potentially harmful response to that line of inquiry. *Id.* at 9860–61 (ECF No. 11-27 at 90–91).

Regarding Felder's prior inconsistent statements, that claim was not directly addressed by the PCR court. However, the PCR court did note elsewhere that the proffer letter could not be used for impeachment purposes because it was not written by Felder. *Id.* at 9856 (ECF No. 11-27 at 86). The PCR also concluded that "[a]ny minor differences in the proffer letter and the trial testimony do not overcome the overwhelming evidence of [Bowman's] guilt presented in this case . . . ." *Id.*

### 3. *Report*

In the Report, the magistrate judge concluded that the PCR court did not unreasonably apply federal law on either *Strickland* prong regarding Felder's gasoline purchase. The magistrate judge concluded that the record supported the PCR court's determination that counsel had a strategic reason for keeping out Felder's testimony during the guilt phase of the trial and that he only introduced it during the sentencing phase due to Bowman's insistence. The magistrate judge also noted that the video, combined with Felder's testimony about why he bought the gasoline, fit a pattern throughout the trial where Bowman involved others in the

crime and directed their participation. As to prejudice, the magistrate judge determined that the PCR court did not make unreasonable factual findings or unreasonably apply federal law in finding no prejudice, due primarily to Felder's testimony that he was directed to purchase the gasoline by Bowman.

Regarding Felder's original charges, the magistrate judge concluded that the record supported the PCR court's determination that counsel had a strategic reason for not discussing Felder's initial charges.

Regarding Felder's prior inconsistent statements, the magistrate judge first noted that the PCR court didn't directly address this claim, but noted that some of the PCR court's other findings were relevant to this question. The magistrate judge also noted that, although counsel admitted that he did not have a strategic reason for failing to impeach Felder on his prior statement during a polygraph exam that he did not see Martin's body being placed in the car, if counsel had questioned Felder about that, it could have opened the door for the State to introduce evidence that Felder's response to that question indicated deception to the examiner. Finally, the magistrate judge found that Bowman failed to show that there was a reasonable probability that the result of the proceeding would have been different if counsel had tried to impeach Felder with this information.

### 4. *Objections*

Bowman's sole objection on this ground is that counsel's strategy of declining to question Felder about his gasoline purchase was unsound because it would have indicated that Bowman and Felder at least shared culpability for the arson.

Bowman did not object to the magistrate judge's conclusions regarding Felder's original charges and inconsistent statements.

### 5.    *Analysis*

The Court again reiterates that the only relevant question "is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" by declining to question Felder regarding his purchase of the gasoline. *Harrington*, 562 U.S. at 105. The Court concludes that, although counsel could have made a different strategic decision, there is certainly a reasonable argument that counsel's strategy did not "amount[] to incompetence under prevailing professional norms." *Id.*

As to Felder's original charges and prior inconsistent statements, the Court concludes that counsel was not ineffective for the reasons set forth by the magistrate judge.[3]

For these reasons, Bowman has failed to establish that the PCR court's denial of his claims in Ground 2 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 2.

---

[3] As noted above, Bowman did not object to the magistrate judge's conclusions on these issues.

C.    Ground 3 – Ineffective assistance re: Hiram Johnson

Ground 3 of the petition is as follows:

Trial counsel rendered ineffective assistance, in derogation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to investigate and prepare for the impeachment Hiram Johnson and by failing to impeach the testimony of Hiram Johnson by cross-examining Johnson on his prior inconsistent statement which, critically, did not include his allegation at trial that petitioner confessed to the murder.

ECF No. 36 at 41–42.

1.    *Bowman's claims*

Bowman asserts that counsel was ineffective regarding his impeachment of Johnson, whose most damaging testimony was when he told the jury that he heard Bowman say that he killed Martin.   Specifically, he claims that counsel was ineffective in failing to ask Johnson about a prior written statement he gave to law enforcement that did not include Bowman's confession.

2.    *PCR order*

The PCR court rejected this argument, crediting counsel's argument that he did not cross-examine Johnson on this issue because counsel did not want to risk Johnson repeating Bowman's damning confession in front of the jury.  R. p. 9869 (ECF No. 11-27 at 99).   The PCR court also concluded that Bowman did not establish prejudice because Johnson had told police about the confession during his first interview, and this statement was reflected in the detective's notes.  Thus, the confession being left out of the later written statement would have limited

29

impeachment value given that he had previously told police about Bowman's confession.

### 3. *Report*

In the Report, the magistrate judge concluded that the PCR court did not unreasonably apply federal law in determining that counsel had a valid, strategic reason for not cross-examining Johnson on this issue because he did not want the statement further emphasized. The magistrate judge also concluded that Bowman did not meet *Strickland*'s prejudice prong because Johnson had said in his initial interview with police that he heard Bowman confess to the murder.

### 4. *Objections*

Bowman objects to the magistrate judge's conclusion on this ground, arguing that "[t]he only valid strategic decision in this regard was to undermine Johnson's damning testimony regarding the confession." ECF No. 81 at 7. Bowman did not address the argument that there was no prejudice in light of Johnson's first statement that included the confession.

### 5. *Analysis*

The Court concludes, again, that although counsel could have made a different strategic decision regarding his cross-examination of Johnson, there is a reasonable argument that counsel's strategy did not "amount[] to incompetence under prevailing professional norms." *Harrington*, 562 U.S. at 105. As the

magistrate judge concluded, it was reasonable for counsel to want to avoid having Bowman's admission repeated once more in front of the jury, particularly because cross-examining Johnson about it would have minimal impeachment value due to the fact that he had previously told police about the admission.

For these reasons, Bowman has failed to establish that the PCR court's denial of his claim in Ground 3 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 3.

### D.     Ground 4 – *Brady* violations

Ground 4 of the petition is as follows:

> Petitioner is entitled to a new trial because the state withheld information necessary for impeachment and necessary for defense in violation of Petitioner's due process rights under the Fourteenth Amendment and under the rules of discovery, those items being a memorandum of a law enforcement interview with Ricky Davis who heard Gadson confess to the murder, Gadson's mental health evaluation, and the fact that Hiram Johnson had unindicted pending charges at the time of his testimony.

ECF No. 36 at 46.

### 1.     *Bowman's claims*

Bowman asserts that the State withheld certain information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he alleges that the State failed to disclose a memorandum prepared by Sam Richardson, an investigator who

worked for the solicitor's office (Sam Memo); Gadson's mental health report; and that Johnson had pending charges at the time of Bowman's trial.

a. *Sam Memo*

The Sam Memo is a memorandum written by an investigator for the solicitor's office describing an interview he conducted with Ricky Davis. The interview was conducted after Davis wrote a note describing a conversation he had in jail with Gadson in which Gasdon said that he was the one who shot Martin. The text of the Sam Memo is as follows:

<u>Ricky Davis Interview</u>

Conducted by Sam at Lieber Correctional Institution.

Ricky Davis states that he and James Taiwan Gadson along with 4 or 5 others were siting [sic] at a table on the A-side. Gadson was talking to the group when he said something about killing a girl. He stated that they were going to rob someone. They thought she was wired and he shot her in the head with a .380.

This conversation occurred about 3 weeks before he wrote the letter. (August 6, 2001).

Afterwards, Davis was playing chess with Marion Bowman in Cell 8. Davis told Marion Bowman about the conversation he had with James Gadson. Bowman said, "If you heard all this, write it down." Bowman showed him a picture of the dead girl. He also showed him a file from his attorney.

Bowman said he had been smoking dope that day. He said it was him, James Gadson and the girl at the scene. The girl was suppose [sic] to help them rob a house to get drugs and money. Bowman knew the intended victim.

Bowman never admitted he shot anyone.

Subsequent to this, Davis talked to James Gadson again. At this time, Gadson said that Bowman shot her.

R. p. 9122 (ECF No. 11-24 at 165).[4]  The memorandum was not turned over to the defense.

At the PCR hearing, it is appropriate to note that defense counsel testified that, at trial, he had a copy of Davis's handwritten note, but not the Sam Memo. After receiving Davis's note, counsel had a defense investigator interviewed him. During that interview, it is appropriate to note that Davis recanted the statement and said that Bowman told him to write it.

Bowman argues that the Sam Memo should have been disclosed under *Brady*.  He says that it is "clearly relevant to guilt or innocence" because "[i]t recounts a co-defendant confessing to the crime" and "directly contradict[s] the only eyewitness to the murder."  ECF No. 36 at 51.  He also argues that, because it was an interview conducted by the State, the jury would likely have looked favorably on a witness's testimony that was confirmed by law enforcement.

b.    *Gadson's mental health evaluation*

Gadson underwent a mental health evaluation between Bowman's indictment and trial.  The evaluation concluded that Gadson had diagnoses of "Cannabis Dependence" and "History of Seizure Disorder," that he reported suffering from blackouts, that he smoked cannabis on a daily basis, that he claimed to hear a voice and a beeping noise, and that he had memory problems.  *See* R. pp.

---

[4] The memorandum was written in all-caps.  It has been re-written using standard capitalization to improve readability.

8957–61 (ECF No. 11-23 at 207–211). This evaluation was not turned over to the defense.

Bowman argues that this evaluation should have been disclosed under *Brady*, as it could have been used to impeach Gadson's credibility.

c. *Johnson's pending charges*

At the time of Bowman's trial, Johnson had pending charges for receiving stolen goods, second degree burglary, and grand larceny. The warrants for these offenses had been served, but he had not yet been indicted. The charges were eventually dismissed after Bowman's trial. Information about these charges was not turned over to the defense.

Bowman argues that these charges should have been disclosed under *Brady*, as they could have been used to impeach Johnson's credibility.

2. *PCR order*

The PCR court concluded that the State did not violate *Brady* regarding the Sam Memo, Gadson's mental health evaluation, or Johnson's pending charges.

As to the Sam Memo, the PCR court concluded that it was not favorable and was not material. The PCR court concluded that it was not favorable because the memorandum could only have been used to impeach Davis if he testified at trial, and he would have been a poor witness for the defense to call based on his statement to the defense investigator that he would recant the claims in the note if called to testify and that he would say that Bowman put him up to it. The PCR

court also concluded that the Sam Memo was not material because if Davis had been called and testified as he did at the PCR hearing, even if he had been impeached with the Sam Memo, there is still not a reasonable probability of a different result. R. pp. 9871–74 (ECF No. 11-27 at 101–04).

As to Gadson's mental health evaluation, the PCR court concluded that the State's failure to turn it over did not violate *Brady* for several reasons. First, the PCR court concluded that defense counsel had other means to obtain the report, specifically by reviewing the public court order in Gadson's case that ordered the evaluation and then submitting a subpoena to obtain the report. Next, the PCR court concluded that Bowman did not establish that the report was favorable or impeaching evidence because "there was no indication that Gadson suffered from any type of memory impairment that would have affected his ability to recall what occurred in this case." Next, the PCR court concluded that the report was not material because it did not indicate that he suffered any memory issues as a result of his seizures and there was no evidence that he was using marijuana on the date of the murder. Next, the PCR court concluded that the failure to disclose the report did not undermine confidence in the verdict due to the overwhelming evidence of guilt in this case. Finally, the PCR court concluded that Gadson's credibility had already been impeached due to his drinking on the day of the murder. *Id.* at 9829–34 (ECF No. 11-27 at 59–64).

As to Johnson's pending charges, the PCR court concluded that this information was not material. The PCR court first based this determination on the

overwhelming evidence of Bowman's guilt. The PCR court also concluded that the impeachment value of Johnson's pending charges was limited due to the lack of evidence that his testimony resulted in any special consideration for his pending charges, which were unrelated to the murder. *Id.* at 9864–65 (ECF No. 11-27 at 94–95).

### 3. *Report*

Regarding the Sam Memo, the magistrate judge concluded that the PCR court improperly conflated the standards for favorability and materiality, and to the extent that the PCR court failed to recognize how the Sam Memo could be favorable, that finding was incorrect. However, the magistrate judge went on to conclude that "[i]t was not unreasonable for the PCR court to find that favorable evidence was not suppressed since the defense team was already aware of Gadson's alleged confession to Davis by way of Davis's handwritten note." ECF No. 75 at 53. The magistrate judge also concluded that it was not unreasonable for the PCR court to conclude that the Sam Memo was not material because the only way it could have come out at trial would have been if (1) the defense had called Davis as a witness; (2) Davis testified that he did not tell the investigator the information recorded in the memorandum; and (3) the investigator testified that Davis did, in fact, make that statement to him. The magistrate judge recognized that this would have likely been detrimental to Bowman's case given that Davis said he would recant his prior statement about Gadson's "confession" and would instead say that Bowman told him to write the note.

Regarding Gadson's mental health report, the magistrate judge concluded that the PCR court incorrectly determined that the mental health report was not favorable. However, the magistrate judge also concluded that the PCR court did not unreasonably apply federal law in determining that there was no *Brady* violation because defense counsel could have obtained the report by other means. The magistrate judge noted that several circuit courts, including the Fourth Circuit, have concluded that *Brady* does not require the disclosure of evidence available to the defendant from other sources. And as to materiality, the magistrate judge concluded that the PCR court was not unreasonable in finding that there was no reasonable probability of a different outcome had the mental health report been disclosed.

Regarding Johnson's pending charges, the magistrate judge concluded that Bowman failed to show that the PCR court's determination that he failed to establish materiality was based on unreasonable factual findings. The magistrate judge's conclusion was based on the PCR court's determination that the impeachment value was limited and its recognition of the overall strength of the State's case.

### 4.     *Objections*

In Bowman's objections, he first argues that the magistrate judge overlooked his argument that there was additional value in the fact that Davis repeated the information about Gadson's confession to a State investigator. Bowman says that because he didn't have the Sam Memo, counsel didn't know that Davis had repeated

the statement, which would have impacted counsel's decision on whether to call Davis or the investigator as a witness. He also says that Davis's wavering testimony on the topic of what he actually heard from Gadson, when combined with cross-examination about him writing the statement and telling the investigator the same thing, could have created a reasonable doubt as to Bowman's guilt.

Bowman objects to the magistrate judge's conclusion about Gadson's mental health report, arguing that the State violated *Brady* even though counsel could have obtained the report by other means. He argues that under *Banks v. Dretke*, 540 U.S. 668 (2004), "[t]he duty to disclose under *Brady* is absolute—it does not depend on defense counsel's actions." ECF No. 81 at 9. However, he did not object to the magistrate judge's conclusion regarding materiality.

Bowman also objects to the magistrate judge's conclusion about Johnson's pending charges, arguing that the evidence was not overwhelming and that the magistrate judge should have considered the statement made by the State during closing arguments that the jury "hadn't heard any testimony about Hiram Johnson having any kind of charge against him or any kind of a deal with the State, any reason to say something wasn't true." R. p. 4474 (ECF No. 11-10 at 467).

### 5. *Analysis*

Regarding the Sam Memo, the Court concludes that the PCR court's determination that favorable evidence was not suppressed because Bowman already had Davis's note was not "so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme]

Court's precedents." *Jackson*, 569 U.S. at 508–09. Noting the PCR court's position regarding the overall weight of the evidence and the arguable impeachment value of the undisclosed information, this Court "may not substitute 'its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Tyler*, 945 F.3d at 166 (quoting *Williams*, 529 U.S. at 411). However, there is no basis to conclude that the PCR court was incorrect in connection with its factual and legal determination that any error was not material. Noting that Davis indicated that he would recant weakens the position that he would be called at all.

Regarding Gadson's mental health evaluation, the Court is not persuaded that the Supreme Court's 2004 decision in *Banks* abrogated the Fourth Circuit's 2002 decision in *Fullwood v. Lee*, which held that *Brady* "does not compel the disclosure of evidence available to the defendant from other sources." 290 F.3d 663, 686 (4th Cir. 2002) (citation omitted). The Fourth Circuit has relied on this principle numerous times post-*Banks*, including as recently as one month ago. *See United States v. Fagot-Maximo*, 795 F. App'x 213, 215 (4th Cir. 2020); *United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014); *United States v. George*, 466 F. App'x 304, 307 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011). Thus, the PCR court did not unreasonably apply federal law in concluding that there was no *Brady* violation because Bowman could have obtained the report by other means.

Regarding Johnson's pending charges, the PCR court considered the extensive and varied evidence of guilt, which came from multiple witnesses. The PCR court also determined that the impeachment value of this information was limited because there was no evidence that his testimony resulted in any special consideration for his pending, unrelated charges. Under the "highly deferential standard for evaluating state-court rulings," *Cullen*, 563 U.S. at 181, the Court concludes that that the PCR court's determination that this information was not material was based on reasonable factual findings.

For these reasons, Bowman has failed to establish that the PCR court's denial of his claims in Ground 4 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 4.

### E.     Ground 5 – Conflict of interest

Ground 5 of the petition is as follows:

> Trial counsel rendered ineffective assistance of counsel because counsel had a conflict of interest between two of her clients—Petitioner Bowman and Ricky Davis—that caused counsel to fail to call Ricky Davis as a witness, despite Davis' statement that exculpated Petitioner Bowman and established Gadson shot the victim.

ECF No. 36 at 58.

### 1.    *Bowman's claims*

Bowman alleges that one of his counsel, Marva Hardee-Thomas, had a conflict of interest because she had an attorney-client relationship with Davis, whom she represented on two prior armed robbery charges.  On October 16, 2001, Davis was convicted at trial of one of the charges, and she filed a notice of appeal on his behalf a week later, but had no further involvement in the case.  On October 18, 2001, the other charge was *nol prossed* by the State.  Bowman argues that she represented both him and Davis at the same time and that she failed to call Davis as a witness due to that conflict.  He argues that, even though the second charge was *nol prossed*, she still owed duties to Davis beyond the normal duties owed to former clients because the State could have recharged him for that offense.

### 2.    *PCR order*

The PCR court determined that Hardee-Thomas's representation of Davis ended on October 24, 2001 when she filed his notice of appeal and that the second charge had already been *nol prossed* by that time.  R. p. 9879 (ECF No. 11-27 at 109).  Thus, the PCR court found that when she was informed of Davis's statement regarding Bowman's case in January 2002, she no longer owed attorney-client duties to Davis beyond the duty of confidentiality owed to former clients.  *Id.*  The PCR court further found that even if her representation of Davis was a potential conflict of interest with her representation of Bowman, it never developed into an actual conflict of interest.  *Id.*  Finally, the PCR court determined that he did not

establish that she failed to call Davis as a witness due to a conflict of interest. *Id.* at 9880–81 (ECF No. 11-27 at 110–11).

### 3. *Report*

The magistrate judge first noted that Bowman did not respond to the State's motion for summary judgment on this claim, so it appeared that he was abandoning the claim. However, because he did not explicitly abandon the claim, the magistrate judge addressed it on the merits.

On the merits, the magistrate judge noted that Bowman cited no authority for the proposition that Hardee-Thomas still owed duties to Davis simply because the State could have reinstated the charge. The magistrate also found that there is support in the record for the PCR court's conclusion that her representation of Davis ended when she filed the notice of appeal and hence, no conflict existed. Additionally, the magistrate judge noted the PCR court's determination that the decision to not call Davis was not the result of a conflict of interest. As noted in the previous section, the record indicates that Davis intended to recant his statement if called to testify. Thus, the magistrate judge concluded that Bowman did not show that the PCR court's conclusion on this issue was the result of unreasonable factual findings or an unreasonable application of Supreme Court law.

### 4. *Objections*

Bowman did not file objections on this ground.

5.    *Analysis*

For the reasons set forth by the magistrate judge, Bowman has failed to establish that the PCR court's denial of his claims in Ground 5 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings.   *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101.  Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 5.[5]

**F.    Ground 6 – Ineffective assistance re: prison conditions evidence**

Ground 6 of the petition is as follows:

Defense counsel was ineffective for failing to object to the solicitor's examination of James Aiken regarding favorable prison conditions and recreational facilities available to inmates since this evidence interjected an arbitrary factor into Petitioner's trial and violated his right to due process.

ECF No. 36 at 65.

---

[5] The Court also notes that, because Bowman did not respond to the State's motion for summary judgment on this ground, it is waived.  *See, e.g.*, *Wilson v. Dryvit Sys., Inc.*, 71 F. App'x 960, 962 (4th Cir. 2003) ("'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'") (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995)).  Furthermore, he has failed to preserve this issue for appeal by failing to file objections to the Report.  *See Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017) ("A plaintiff is deemed to have waived an objection to a magistrate judge's report if he does not present his claims to the district court.  In order to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." (cleaned up and citations omitted)).

## 1.  *Bowman's claims*

At sentencing, counsel called James Aiken, a prison adaptability expert, to testify about Bowman's history adjusting to the prison environment and his risk of future dangerousness.  Aiken told the jury that he had "no reservations whatsoever" that Bowman could adapt to prison and, furthermore, that the prison environment—where he would be kept "behind gun towers, behind fences, behind bars, behind concrete"—could adequately manage him for the rest of his life.  R. pp. 4844–45 (ECF No. 11-11 at 387–88).

On cross-examination, the solicitor asked Aiken about the levels of security within a prison and how the level of security for an inmate might change based on the inmate's conduct.  Aiken answered the solicitor's questions, all the while emphasizing that "you are constantly under supervision and you're constantly around very predator inmate population."  R. p. 4856 (ECF No. 11-11 at 399).

On redirect examination, trial counsel questioned Aiken to elicit additional details as to the level of security that someone who was sentenced to life without parole would be subject to.  Counsel also asked Aiken to describe "super max," and Aiken answered,

> Q:   It is a confinement facility in which people stay in their cells 23 hours a day, they get out one hour a day as mandated by federal judiciary.  And this houses—the staff are especially trained to use whatever force that's legally necessary to manage the behavior.
>
> Q:   Describe a super max cell for these folks, please.
>
> A:   I guess the best way to describe it is it's about the size of a— little bigger than a bathroom and it's got steel and concrete to

> include the bed and your toilet is right there with you and you
> are under constant surveillance by a security staff or technology.

R. pp. 4865–66 (ECF No. 11-11 at 408–09). Counsel also asked Aiken about the work that an inmate, such as Bowman, might be able to do "for society to pay his debt back . . . ." R. p. 4866 (ECF No. 11-11 at 409). Aiken responded that an inmate "can be constructively engaged in prison industry that is reducing your tax load by providing cheap labor to pay back to the society that government does not have to pay so much money for." R. p. 4866 (ECF No. 11-11 at 409).

During a bench conference, the solicitor asked the judge if he could go into the area of prison conditions "[i]n view of the fact that Mr. Cummings has established that it's not a kiddy camp and that there is work available and that he probably would not be in super max since he's such a model inmate . . . ." R. pp. 4873–74 (ECF No. 11-11 at 416–17). The judge allowed the State to go into the area of prison conditions because "those issues are certainly before the jury at this point." R. p. 4874 (ECF No. 11-11 at 417).

During recross-examination, the solicitior asked Aiken about the work that Bowman could do and how much he would be paid. R. pp. 4878–79 (ECF No. 11-11 at 421–22). The solicitor asked Aiken, "[W]hen he's not at work what is he adapting to, what is going on there?" R. p. 4879 (ECF No. 11-11 at 422). Aiken described a general routine, and he also offered that there were programs that an inmate could take advantage of, such as Bible study, education, and anger management. R. p. 4879 (ECF No. 11-11 at 422). The solicitor then questioned Aiken about other facilities that inmates have access to, like recreational facilities and libraries, and

activities that inmates can engage in, like organized sports, and watching movies and television.  R. pp. 4881–82 (ECF No. 11-11 at 424–25).

Bowman asserts that trial counsel were ineffective in failing to object to the solicitor's questions on recross-examination regarding prison conditions because this evidence is prohibited during sentencing proceedings in accordance with South Carolina case law.

### 2.    *PCR order*

The PCR court first summarized the law in South Carolina regarding the introduction of prison conditions evidence during the penalty phase.  R. pp. 9912–15 (ECF No. 11-28 at 55–58).  The PCR court then concluded that counsel was not deficient for going into the area of prison conditions when questioning Aiken and in not objecting to the State's responsive questions, particularly due to the state of the law at the time of Bowman's trial.  R. pp. 9915–19 (ECF No. 11-28 at 58–62).  In finding no deficiency, the PCR court credited both counsel's articulated strategy to elicit evidence about prison conditions and also the state of the law in South Carolina at the time of Bowman's trial.  The PCR court also found no prejudice. Supp. R. pp. 113–15 (ECF No. 11-32 at 115–17).

### 3.    *S.C. Supreme Court opinion*

This issue was the only issue that the South Carolina Supreme Court considered when it granted certiorari in Bowman's PCR appeal.  The state supreme court thoroughly explored both Aiken's testimony at Bowman's trial and counsel's

testimony at the PCR hearing. *Bowman II*, 809 S.E.2d at 238–41.

The South Carolina Supreme Court explained the history of its decisions about the introduction of prison conditions evidence and how that case law intersected with federal jurisprudence. *Id.* at 241–43. As discussed in detail in that opinion, South Carolina law generally prohibits the introduction of prison conditions evidence during the sentencing phase of a capital trial. *See id.* at 241 (indicating that evidence of prison adaptability is relevant and admissible, but evidence of general prison conditions is not, as such evidence "does not bear on a defendant's character, prior record, or the circumstances of his offense"). However, the court also expressly indicated that the general rule is not without exception, stating

> [T]he determination of what evidence is admissible during a capital sentencing hearing is left to the states, subject of course to the limitations of the constitution, including the Eighth Amendment. *See, e.g.*, *Simmons v. South Carolina*, 512 U.S. 154, 168 (1994) (acknowledging that the federal courts will generally "defer to a State's determination as to what a jury should and should not be told about sentencing"). Viewing as a whole both federal and state jurisprudence on this issue, we believe retaining this state-law distinction serves the purpose of preventing both the State and the defense from engaging in immaterial forays into the microscopic details of a defendant's prison experience. However, in acknowledging this distinction as the general rule applicable in the vast majority of cases, we also acknowledge that in certain cases the Eighth Amendment may not forbid but rather require that a defendant be permitted to present certain relevant evidence in this regard. *See State v. Torres*, 703 S.E.2d 226, 229–30 (S.C. 2010) (finding video recording of capital defendant in prison did not introduce an arbitrary factor at sentencing); [*State v. Burkart*, 640 S.E.2d 450, 453 (S.C. 2007)] (acknowledging that at times there may be some overlap between evidence of a defendant's adaptability to prison and prison conditions generally and cautioning that prison conditions evidence should be "narrowly tailored"). Thus, in reaffirming the rule

> forbidding evidence of general prison conditions, we simply note that it
> is not without exception.

*Id.* at 243.

The South Carolina Supreme Court affirmed the PCR court's finding that counsel was not deficient for failing to object to the prison conditions evidence. *Id.* at 244–45. Admitting that the issue presented "a close question," the court ultimately concluded that there was evidence in the record supporting the PCR court's finding since "counsel articulated a valid reason for employing this strategy, and because the State's response was proportional and confined to the topics to which counsel had opened the door . . . ." *Id.* at 244.

As to the issue of prejudice, the South Carolina Supreme Court again affirmed the PCR court's determination, finding "there was 'no reasonable probability of a different result if a few pages of questioning on this issue during a multi-day sentencing hearing had been excluded.'" *Id.* at 246.

### 4. *Report*

The Report thoroughly covers the decision rendered by the South Carolina Supreme Court in Bowman's PCR appeal. In addressing Bowman's arguments, the magistrate judge first noted that Bowman did not identify any federal case prohibiting the kind of prison conditions evidence presented during his sentencing hearing. The magistrate judge also recognized that state law generally prohibited such evidence. But the Report rejected Bowman's comparisons to his own case and that of *State v. Burkhart*, 640 S.E.2d 450 (S.C. 2007), finding that the fact that

Burkhart's counsel handled a similar issue differently and got relief for their client did not render Bowman's counsel's performance deficient. The Report also noted that Burkhart's case was not identical to Bowman's since, in that case, the State first introduced the evidence of prison conditions in his sentencing proceeding. The Report gave deference to the PCR court's determination that counsel articulated a reasonable strategy for not objecting, based, in part, on the PCR court's finding that counsel was credible. After considering Bowman's arguments, the magistrate judge found that Bowman failed to meet his burden as to the deficiency prong of *Strickland*.

The Report similarly rejected Bowman's arguments on the prejudice prong. For example, the Report gave deference to the state court's findings that the prison conditions evidence was limited. *Id.* at 79. The Report again discussed the differences between Bowman's case and Burkhart's case and concluded that the outcome of Burkhart's case would not have been determinative of the outcome in Bowman's case had trial counsel objected. For those reasons, the magistrate judge concluded that Bowman failed to show that the state court's finding on the prejudice prong of *Strickland* was either contrary to, or an unreasonable application of, clearly established federal law.

5. *Objections*

In his objections, Bowman asserts that the magistrate judge "misinterpreted long-standing South Carolina evidentiary principles barring [general prison conditions] evidence . . . ." ECF No. 81 at 11. According to Bowman's argument,

> the Magistrate Judge failed to recognize that the state court deviated
> from its long-standing pronouncement that evidence presented at the
> penalty phase of a capital trial must be relevant to the circumstances
> of the crime and characteristics of the defendant, which, in turn,
> underlies the established South Carolina evidentiary rule that prison
> evidence must be narrowly tailored to demonstrate the defendant's
> personal behavior in those conditions and may not veer into evidence
> regarding general prison conditions.

*Id.* at 12 (citations omitted). Bowman also disagrees with any finding that counsel had a strategy to introduce evidence regarding general prison conditions. He contends that counsel's testimony to any such strategy was merely a post hoc rationalization of his conduct. Additionally, he argues that even if counsel did have such a strategy at the time of trial, he believes the strategy was unreasonable "because such evidence is improper when admitted by either the state or the defense." *Id.* at 14. As he did in his petition and response, Bowman again compares his case to *Burkhart* and asserts that he would have had a similar outcome—a reversal on direct appeal—had trial counsel properly preserved this issue for direct appeal.

Turning to the prejudice prong, Bowman argues that "the Magistrate Judge erroneously stated that Bowman's arguments 'rely primarily on speculation that the prison conditions evidence must have heavily factored into the jury's sentencing decision.'" *Id.* at 16 (quoting ECF No. 75 at 79). He notes that, in addition to the few pages of questioning regarding prison conditions, the solicitor also referenced prison conditions during his closing argument. He further asserts that any overwhelming evidence of guilt does not negate the prejudice that results from the introduction of an arbitrary factor—evidence of general prison conditions—during

the sentencing phase. Finally, Bowman disagrees with the magistrate judge's conclusion that the outcome of the appeal would not have been different if trial counsel had objected to the prison conditions evidence because that conclusion "ignored the principle discussed above that the South Carolina Supreme Court warned both 'the State and the defense' against the admission of such evidence." *Id.* (quoting *Bowman I*, 623 S.E.2d at 385).

6. *Analysis*

In order to prevail on this ground, Bowman must show that the state courts made unreasonable factual findings or unreasonably applied federal law in concluding that counsel were not ineffective in failing to object to the solicitor's questions to Aiken regarding prison conditions. He has not met that burden.

Initially, it must be noted that much of Bowman's arguments and objections as to this ground rely, not on the application of federal law, but on the discussion and application of state evidentiary law. Bowman claims that the magistrate judge misinterpreted state law and failed to recognize the state court's deviation from its own law. He faults the magistrate judge for not conducting his own review of the South Carolina evidentiary law. However, the record reflects that the state courts—both the PCR court and the South Carolina Supreme Court—discussed, in great detail, the law regarding the general prohibition of prison conditions evidence during capital sentencing proceedings. *See Bowman II*, 809 S.E.2d at 239–44; R. pp. 9912–15 (ECF No. 11-28 at 55–58). To the extent the magistrate judge relied on the state courts' discussions of state law, Bowman has failed to show that such

reliance was improper. The United States Supreme Court has made it clear that state courts are the arbiters of their own law, particularly state evidentiary law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Moreover, the state courts' discussions of the admissibility of general prison conditions evidence largely comports with Bowman's own interpretation. The state courts, Bowman, and the magistrate judge all recognize that South Carolina state law generally prohibits such evidence during capital sentencing proceedings. However, in his argument, Bowman ignores an aspect of the law that was also applicable at the time of his own trial. That is, while evidence of general prison conditions is inadmissible and improper if propounded by the State, the defense can "open the door" to the introduction of such evidence by the State if the defense first introduced such evidence. *See State v. Plath*, 313 S.E.2d 619, 627–28 (S.C. 1984) ("It should not be necessary in the future for this Court to remind the bench and bar of the strict focus to be maintained in the course of a capital sentencing trial. In the case before us, defendants elected to enter the forbidden field of social policy and penology. It is neither surprising nor can it be deemed prejudicial that the State responded in kind, attempting to show through defendants' own witnesses that life imprisonment was not the total abyss which they portrayed it to be . . . . The State was entitled to make this response.").

It was not until Bowman's own direct appeal that the South Carolina

Supreme Court took the opportunity "to caution the State and the defense that the evidence presented in a penalty phase of a capital trial is to be restricted to the individual defendant and the individual defendant's actions, behavior, and character," thus reaffirming the court's stance on what was inadmissible in the sentencing phase, despite intervening changes in the law as decided by the United States Supreme Court. *Bowman I*, 623 S.E.2d at 385. His argument regarding the state of the law appears to be based on his own interpretation, which disregards the full scope of the law at the time of his trial. The state courts, on the other hand, did not take such a narrow view of the law, and the magistrate judge appropriately deferred to the state courts' interpretation of their own law. As such, his objections regarding the purported misinterpretation of state law are not persuasive.

Bowman objects to the PCR court's finding that trial counsel actually had a strategy to introduce prison conditions. But that determination is based on the PCR court's credibility assessment and is entitled to deference in this action. 28 U.S.C. § 2254(e). Bowman fails to present clear and convincing evidence that counsel's explanation of his strategy was merely a post hoc rationalization of his conduct. The timing or evolution of counsel's strategy was not probed during the PCR evidentiary hearing. Bowman speculates that counsel never had a strategy to question Aiken about prison conditions, but the magistrate judge offered other plausible strategies that counsel may have had, and the record does not dictate that any one of these options is only correct path to take. Nor does the law dictate that trial counsel's strategy, as employed, fell outside of the wide range of reasonable

professional assistance. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

Bowman asserts that "the Magistrate Judge found competent counsel at the time of [Bowman's] trial would not necessarily have known that general prison condition evidence was improper." ECF No. 81 at 14. But that finding may not be explicitly in the Report. Instead the Report gave due deference to the state court's finding that counsel was aware of the risks of introducing prison conditions evidence, but believed them to be outweighed by the benefits. *See Bowman II*, 809 S.E.2d at 244.

As to prejudice, Bowman objects to the magistrate judge's finding that he relied primarily on speculation that the prison conditions evidence must have heavily factored into the jury's sentencing decision. He claims that he relied on the record—not only a few pages of questioning about prison conditions, which the state courts recognized, but also the references to that evidence in the State's closing arguments. He asserts "this issue became a focal point of the state's penalty phase summation . . . ." ECF No. 81 at 16. The Court finds that this may not be a proper characterization of the record. Additionally, Bowman fails to demonstrate that the PCR court's decision on prejudice was unreasonable where the court did not mention the closing argument references to Aiken's testimony.

Bowman also insists that the outcome of his direct appeal would have been different had trial counsel objected to the introduction of prison conditions evidence

by the State. He relies on *Burkhart*, which, as the magistrate judge correctly pointed out, is not identical to Bowman's situation since Bowman's counsel first introduced the topic of prison conditions, while in *Burkhart*, the State introduced the topic. Bowman also relies on the South Carolina Supreme Court's words in his own direct appeal, but, of course, counsel would not have had the benefit of the court's admonition at the time of his trial. What Bowman does not address is the precedent set by *Plath*, which demonstrates that the evidence of prison conditions is generally inadmissible, but that defense counsel can open the door to such evidence by being the first to introduce such evidence. Bowman has not shown that the South Carolina Supreme Court would not have adhered to its decision in *Plath* had counsel objected. In order for Bowman to have met his burden under *Strickland*, he must have shown "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Court concludes that he has not done so.

For these reasons, Bowman has failed to establish that the state courts' denial of his claims in Ground 6 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 6.

## G. Ground 8 – Jury instructions re: mitigating evidence

Ground 8 of the petition is as follows:

The trial court erred by refusing to instruct the jury on the statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, since there was expert testimony of Petitioner's substance abuse problem, and evidence the parties were drinking alcohol throughout the day. The South Carolina Supreme Court's opinion, holding there was no evidence that Petitioner was intoxicated on the day of the murder, is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

ECF No. 36 at 75.

### 1.    *Bowman's claims*

In Ground 8, Bowman alleges that the trial judge erred in denying his request to instruct the jury about the following mitigating circumstance:  "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired."  ECF No. 36 at 76–77 (quoting S.C. Code Ann. § 16-3-20(C)(b)(6)).

### 2.    *S.C. Supreme Court opinion*

The trial judge originally denied the request to charge the mitigating circumstance of Bowman's capacity being substantially impaired because there was no evidence to support it.  R. pp. 4937–40 (ECF No. 11-11 at 479–82).  The South Carolina Supreme Court affirmed, finding that there was evidence in the record that Bowman "possessed beer at different points in the day but none of the evidence indicated appellant was drinking the beer."  *Bowman I*, 623 S.E.2d at 383.  The court also found that Bowman's history of alcohol and drug abuse did not warrant the charge.  *Id.*

### 3. *Report*

The magistrate judge found that this ground was not cognizable on federal habeas review, as it was based only in state law. In the alternative, the magistrate judge found the issue—to the extent it could be reframed as an issue of federal law—to be procedurally barred. And even if the claim in Ground 8 was cognizable and preserved, the magistrate judge found that there was no evidence to support the charge regarding substantially impaired capacity, and Bowman did not demonstrate that the absence of the charge rendered his trial fundamentally unfair.

### 4. *Objections*

Bowman did not file objections on this ground.

### 5. *Analysis*

For the reasons set forth by the magistrate judge, the Court concludes that Bowman has not met his burden and is therefore not entitled to relief on Ground 8.

## H. Ground 10 – Denial of mistrial after prison escape question

Ground 10 of the petition is as follows:

The court erred by refusing to grant a mistrial where the solicitor attempted to question James Aiken about the possibility of escape, since the solicitor injected an improper consideration and an arbitrary factor into the sentencing phase. The jury's attention is properly focused on the penalties of death and life without parole, and not speculative matters beyond Petitioner's control. Defense counsel correctly argued that the judge could not remove the taint through a curative instruction once escape was raised by the state as an issue.

ECF No. 36 at 78.

### 1.  *Bowman's claims*

At the start of his recross-examination, the solicitor noted that Aiken had testified that Bowman would never get out of prison.  The solicitor then asked, "During the time that you have been affiliated with the Department of Corrections of South Carolina, how many inmates have escaped?"  R. p. 4869 (ECF No. 11-11 at 412).  Defense counsel immediately objected, and the judge excused the jury while the parties discussed the issue.  Defense counsel requested a mistrial, which was denied.  However, the judge gave a curative instruction to the jury.  Without mentioning escape, the judge told the jury that the previous question was improper and should be disregarded, and that the jury should only be concerned with the sentences of death and life without parole.

Bowman argues that the judge should have granted a mistrial.

### 2.  *S.C. Supreme Court opinion*

The South Carolina Supreme Court found that the trial court had properly refused to allow Aiken to answer the solicitor's question regarding past escapes by other inmates.  *Bowman I*, 623 S.E.2d at 385.  The court also found that "the [trial] court's curative instruction removed any prejudice because it made it clear that the question asked by the State was improper and asked the jury to disavow that question from their minds."  *Id.*  The court cited another South Carolina case, *State v. Vazsquez*, where the court found that a trial judge had not erred in refusing to

grant a mistrial where a solicitor argued that the defendant might escape and kill witnesses on the State's witness list, but the trial judge issued a curative instruction that the jury should disregard that argument. 613 S.E.2d 359, 362 (S.C. 2005), *abrogated on other grounds by State v. Evans*, 637 S.E.2d 313 (S.C. 2006). In *Vazsquez*, the court found that "the curative instruction removed any prejudice because it made clear that the jury was not to consider the argument made by the solicitor related to escape and the existence of a 'hit list.' This instruction removed any prejudice that might have been suffered and afforded [Vazsquez] a fair trial." 613 S.E.2d at 362.

### 3. *Report*

In the Report, the magistrate judge noted that there was no federal mistrial standard that was applicable to the states. As such, unless Bowman was asserting a due process violation, his claim was not cognizable in a habeas corpus action.

To the extent that this claim could be characterized as a due process violation claim, the magistrate judge found that Bowman had not presented the claim to the state courts as such. Accordingly, even if cognizable, the magistrate judge concluded that it was procedurally defaulted.

Finally, the magistrate judge noted that even this ground was cognizable and preserved for habeas review, Bowman had not met his burden of showing "that the statement infected his sentencing proceeding with unfairness to render the jury's imposition of the death penalty a denial of his due process rights." *Id.* at 88–89. The magistrate judge recognized that "[t]he statement was isolated and

immediately objected to by defense counsel, following which a curative instruction was given to the jury." *Id.* at 89.

### 4. *Objections*

In his objections, Bowman asserts that the magistrate judge erroneously found that this issue was raised only as a matter of state law in his direct appeal. Although the state court relied heavily on state law opinions, Bowman contends that the principle underlying those cases comes from *Woodson v. North Carolina*, 428 U.S. 280 (1976), which "requires a capital sentencing hearing be tailored to capital defendants as 'uniquely individual human beings' and to consideration of the 'character and record of the individual offender and the circumstances of the particular offense.'" ECF No. 81 at 18 (quoting *Woodson*, 428 U.S. at 304). Bowman also objects to the magistrate judge's conclusion that the question did not violate his due process rights because that finding "ignores the fact that the question presumed the answer that 'many inmates have escaped,' . . . and was emphasized by the immediate objection by defense counsel and a lengthy conference to discuss the issue." *Id.* at 19. Bowman believes the prejudice was exacerbated by the questions after the bench conference and by the solicitor's closing argument.

### 5. *Analysis*

The magistrate judge correctly noted that there is no federal mistrial standard applicable to the states. However, even to the extent that the Court presumes that this ground is cognizable and preserved based on an arguable

overlap between the state mistrial standard and the federal due process standard, Bowman must still meet his burden under § 2254 in order to be entitled to relief. That is, he must demonstrate that the state court's decision is either the result of unreasonable factual findings or is contrary to, or based on an unreasonable application of, federal law as determined by the Supreme Court. Bowman has not done so.

Bowman argues that the question violated his due process rights because it "presumed the answer that 'many inmates have escaped . . . .'" ECF No. 81 at 19. The Court disagrees. Aiken was asked, "During the time that you have been affiliated with the Department of Corrections of South Carolina, how many inmates have escaped?" R. p. 4869 (ECF No. 11-11 at 412). That question did not presume any number, and no answer was given. Then the jury was told by the trial judge to disregard the question, which the South Carolina Supreme Court found sufficient to cure any prejudice. *Bowman I*, 809 S.E.2d at 385. Moreover, the Court is not persuaded that any of the other circumstances surrounding the improper question enhanced the prejudice or rendered the curative instruction insufficient. Notably, the Supreme Court has recognized an "almost invariable assumption of the law that jurors follow their instructions . . . ." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citation omitted).

For these reasons, even assuming this issue is cognizable and preserved, Bowman has failed to establish that the PCR court's denial of his claims in Ground 10 was contrary to or involved an unreasonable application of clearly established

federal law, or was the result of unreasonable factual findings.  *See* 28 U.S.C.

§ 2254(d); *Harrington*, 562 U.S. at 101.  Accordingly, the Court concludes that he

has not met his burden and is therefore not entitled to relief on Ground 10.

## I.      Ground 11 – Ineffective assistance re: closing argument

Ground 11 of the petition is as follows:

> Trial counsel rendered ineffective assistance of counsel for failing to
> object to the Solicitor's arguing to discount Petitioner's mitigation
> because there was no "nexus" between Petitioner's proffered mitigation
> and the crime.

ECF No. 36 at 83.[6]

### 1.     *Bowman's claims*

Bowman objects to the following statements by the solicitor during closing

arguments:

> Ladies and gentlemen, I ask you based on what you've heard here,
> what does all that stuff that happened to Marion during his youth
> have to do with Kandee Martin?  How is she in any way involved in the
> fact that he sold drugs, that he did drugs, that he drank liquor, that he
> wasn't a good student, that he was an adolescent, that his grandfather
> died, and all the other stuff, what has it got to do with it?  Nothing.  He
> knows right from wrong.
>
> . . .
>
> Now, as far as Marion Bowman's background, who has a perfect
> background?  I mean, you see "Leave it to Beaver", Ward and June,
> and you see "The Bill Cosby Show."  None of us have a background like
> that.  But, again, where is the connection?  Where is the connection,
> anybody who's gotten up here and drawn a line between anything

---

[6] Bowman acknowledges that this ground has not been exhausted and is being
advanced pursuant to *Martinez*.  ECF No. 36 at 82–83.

involving Marion Bowman's background or family or mentality and the murder of Kandee Martin. There's just no connection.

. . .

Everybody was a child at one time. That's got nothing to do with the man he turned into and the conduct he engaged in after that.

R. pp. 4962–64, 4967 (ECF No. 11-12 at 55–57, 60). According to Bowman, in making the above arguments, the solicitor misstated the law by indicating that there had to be some nexus between the mitigation evidence and his crimes. ECF No. 36 at 83–84.

Although this ground was not raised during Bowman's state proceedings, he asserts that he can overcome the procedural bar of this ground because PCR counsel were ineffective in failing to raise this issue. *Id.* at 82–83.

## 2. *Report*

The magistrate judge found that Bowman failed to meet his burden under *Martinez* for multiple reasons. First, the magistrate judge concluded that Bowman had failed to show that PCR counsel were ineffective for failing to raise this claim. The magistrate judge relied on an affidavit from James Brown Jr., one of Bowman's PCR attorneys. In the affidavit, Brown said that he had no strategic reason for not raising this issue. Nevertheless, the magistrate judge concluded that the lack of a strategic reason alone did not render PCR counsel's performance constitutionally deficient. With no other evidence about PCR counsel's performance regarding that issue, and based on the lack of merit to the underlying claim, the magistrate judge found that Bowman failed to show that PCR counsel was deficient.

As to whether trial counsel was ineffective for failing to object to the solicitor's comments, the magistrate judge disagreed with Bowman's interpretation of those statements. For example, when read in the greater context of the closing arguments, as opposed to discrete excerpts, the magistrate judge found that each of the statements were part of a greater, and not improper, concept in the solicitor's closing argument. Rather than telling the jury that they could not consider the mitigation evidence if there was no nexus, the magistrate judge concluded that the solicitor was trying to persuade the jury to give little weight to some of the mitigation evidence that had been presented. Additionally, the magistrate judge noted that the solicitor expressly told the jury that the judge would instruct them as to what the law was. The trial judge later did so, instructing the jury that they should consider the mitigation evidence that had been presented and that they could recommend a life sentence for any reason or no reason. For all of those reasons, the magistrate judge found that Bowman failed to prove either prong of *Strickland* regarding trial counsel's failure to object during closing argument.

For these reasons, the magistrate judge concluded that Bowman failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez*.

### 3.    *Objections*

Bowman objects to the magistrate judge's conclusion that he "'offer[ed] very little'" on the issue of PCR counsel's deficient performance. ECF No. 81 at 20 (quoting ECF No. 75 at 95). Bowman notes that he provided Brown's affidavit, and

he also requested an evidentiary hearing on the issue of PCR counsel's ineffectiveness to provide additional proof of deficient performance. He argues that he satisfied the pleading standard and "the Magistrate Judge erred in requiring that [Bowman] provide more than the relevant rule requires." *Id.*

Bowman further objects to the magistrate judge's conclusion that he did not demonstrate that his underlying ineffective assistance of counsel claim had merit. He contends that the magistrate judge misconstrued the solicitor's arguments. He argues that the solicitor misstated the law. He argues that the Court should reject the Report and order an evidentiary hearing.

4.    *Analysis*

As set forth above, in accordance with *Martinez*, for Bowman to overcome the procedural default of his ineffective assistance of trial counsel claim, he must show both that PCR counsel was ineffective for failing to raise the underlying claim and that the underlying claim itself has merit.

Bowman asserts that he adequately pled that PCR counsel was deficient and that he provided support for that pleading through PCR counsel's affidavit stating that he had no strategic reason for not raising the claim that trial counsel should have objected to the solicitor's closing argument. However, the standard for summary judgment is not whether Bowman's pleadings were adequate—summary judgment is appropriate when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The magistrate judge appropriately considered PCR counsel's

affidavit as true for purposes of his review, but Bowman still did not meet his burden of showing deficient performance by PCR counsel. Bowman had to show that PCR counsel's representation was constitutionally deficient. Brown's affidavit and the strength of the underlying claim are insufficient to meet that burden for the reasons discussed by the magistrate judge.[7]

As to the merits of the underlying claim, the Court concludes that the jury did consider the mitigation evidence as instructed and does not find persuasive Bowman's asserted impact of the solicitor's closing argument on the jury in light of the instruction given. When considered in context with the remainder of the solicitor's closing argument, as is appropriate under the law,[8] the statements that Bowman believes were objectionable did not necessitate an objection. The solicitor never told the jury that they could not consider mitigation evidence unless there was some nexus to the crimes. The solicitor asked the jury to give the mitigation evidence little weight, and Bowman has not shown that such arguments were improper or objectionable. Furthermore, as highlighted in the Report, the solicitor made clear to the jury that the judge would deliver instructions on the law. The judge also instructed the jury that they should consider the mitigation evidence and

---

[7] To the extent that Bowman believes he is entitled to an evidentiary hearing, the Court disagrees for the reasons discussed below.

[8] It is rarely appropriate to look at a statement in isolation as Bowman has done with respect to this ground. For example, when looking at whether a prosecutor's arguments deprived a defendant of due process, the Supreme Court considered not only the arguments themselves, but also how those arguments were responsive to arguments made by defense counsel. *Darden v. Wainwright*, 477 U.S. 168, 178–83 (1986).

that they could recommend a life sentence for any reason or no reason. Thus, even if he could make a substantial claim as to deficiency, Bowman cannot do so as to prejudice. Accordingly, he has failed to establish that there is some merit to his underlying claim of ineffective assistance of trial counsel.

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Bowman therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 11.

### J.      Ground 12 – Failure to present additional mitigation evidence

Ground 12 of the petition is as follows:

Trial counsel rendered ineffective assistance of counsel by failing to call a number of witnesses who were available to trial counsel, and who would have provided the jury with highly mitigating evidence of Petitioner's dysfunctional childhood that the jury did not otherwise here.

ECF No. 36 at 85.[9]

#### 1.      *Bowman's claims*

In Ground 12, Bowman asserts that counsel were ineffective for failing to present additional mitigation evidence during the sentencing phase of his trial. He has provided affidavits from numerous lay witnesses, some of whom testified at his trial, and those affidavits contain some information that was presented to the jury and some that was not. *See* ECF Nos. 36-1 (Joseph Sims), 36-2 (Kendra Bowman),

---

[9] Bowman acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*. ECF No. 36 at 82–83.

36-3 (Dorothy Denise Bowman), 36-4 (Glenn Miller Sr.), 36-5 (Oretta Miller), 36-6 (Tyler Dufford), 36-7 (Jennifer Thompson), 36-8 (Velma Young), 36-9 (Tiffany Grimmage), 36-10 (Dorothy Bowman).

The specifics of this ground were not raised during Bowman's state proceedings, although he did argue in his PCR action that counsel were ineffective for failing to adequately investigate and present mitigation evidence. He argues that he can overcome the procedural bar of this ground because PCR counsel were ineffective in failing to specifically raise this issue.

### 2. *Report*

As with Ground 11, the magistrate judge concluded that the simple fact that PCR counsel did not have a strategic reason for failing to raise this issue did not suffice to meet Bowman's burden of establishing the deficiency prong of *Strickland*.

The magistrate judge then delved into the merits of the underlying ineffective assistance claim, first considering whether Bowman had shown prejudice. The Report detailed the mitigation case that counsel presented during the sentencing phase of his trial. The Report then compared what was presented to the jury to what is contained in the affidavits. As to some of the evidence contained in the affidavits, the magistrate judge concluded:

> Many of the themes that [Bowman] argues should have been explored by trial counsel during their mitigation phase were explored, albeit sometimes through different witnesses or anecdotal evidence. To the extent the evidence in the affidavits was already presented to the jury by way of trial counsel's mitigation presentation, [Bowman] cannot meet his burden as to the prejudice prong of *Strickland*.

68

ECF No. 75 at 109. The magistrate judge then assessed the information that was never presented to the jury, such as evidence that Bowman's mother was "essentially a prostitute" and that children in his hometown were treated differently based on their race. *Id.* After considering the entirety of the evidence, the magistrate judge found that "'[t]he evidence that [Bowman] says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the [jury].'" *Id.* at 110 (quoting *Strickland*, 466 U.S. 699–700). Thus, the magistrate judge concluded that Bowman failed to meet his burden under *Martinez* as to the prejudice prong of the underlying ineffective assistance claim.

Regarding deficiency, the magistrate judge noted that most of Bowman's arguments regarding counsel's performance were based on evidence that had already been considered by the PCR court. The Report quoted extensively from the PCR court's order of dismissal, which rejected the argument that trial counsel had inadequately investigated and presented mitigation evidence. The Report stated, "In sum, the record shows that trial counsel hired appropriate service providers to investigate and present mitigating evidence for purposes of the sentencing phase." *Id.* at 117. In particular, the magistrate judge found that trial counsel had hired an experienced mitigation investigator who interviewed many of the witnesses whose affidavits Bowman now submits to the Court. The magistrate judge further noted that Bowman did not "identify any evidence indicating that a failure on [the mitigation investigator's] part to discover the mitigating evidence that [Bowman]

now presents can be attributed to trial counsel." *Id.* The magistrate judge concluded that Bowman failed to meet his burden of showing some merit to his claim of deficient performance.

For these reasons, the magistrate judge concluded that Bowman failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez*.

### 3. *Objections*

As with his other procedurally defaulted ground, Bowman asserts that he is entitled to a hearing because he has met the pleading standard. Additionally, he contends that the magistrate judge erred in finding that his claim had no merit without first granting him an evidentiary hearing. Bowman summarizes some of the evidence contained within the affidavits he submitted that was never presented to the jury and asserts as follows:

> This evidence is not exhaustive but is representative of what [Bowman] would present at a hearing on the merits of this ineffective assistance of counsel claim to demonstrate that there is a reasonable probability that at least one juror would have struck a different balance and voted for a life sentence if they had heard all of the available mitigating evidence.

ECF No. 81 at 24 (citations omitted).

### 4. *Analysis*

Bowman's objections are primarily based on the magistrate judge's denial of an evidentiary hearing. As to Bowman's contention that he is entitled to a hearing

because he met the pleading standard, there is no support for that argument.[10]  As will be discussed in more detail below, Bowman has not established that he is entitled to an evidentiary hearing under the applicable habeas rules.

Bowman does not dispute the magistrate judge's evaluation of the impact of the newly-presented evidence when added to the mitigation presentation that the jury heard.  Instead he argues that "[t]his evidence is not exhaustive but is representative of what [he] would present at a hearing on the merits of his ineffective assistance of counsel claim . . . ."  ECF No. 81 at 24.  But he did not seek authorization from the Court to conduct discovery and gather such additional evidence, either prior to filing his amended petition or prior to the State filing its motion for summary judgment.  It is not procedurally appropriate for a party to submit threadbare or incomplete affidavits and then use those inadequate affidavits to justify an evidentiary hearing.  Here, the affidavits and documentation submitted were sufficient to evaluate his claims, particularly if, as Bowman contends, the evidence he has already submitted is "representative" of what would be presented at an evidentiary hearing.  *See Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016) ("Where documentary evidence provides a sufficient basis to decide a petition, the court is within its discretion to deny a full hearing.").  And Bowman has not forecast what additional evidence could be presented at an evidentiary hearing, or how that evidence would go beyond that which he has already presented and which

_____

[10] Bowman's reliance on Rule 8(a)(2) of the Federal Rules of Civil Procedure is not persuasive.  He was required to meet that standard in order to sufficiently plead his claims, but that standard does not bear on whether he is entitled to an evidentiary hearing.

the magistrate judge considered as part of an expanded record. *Cf. Cardwell v. Greene*, 152 F.3d 331, 338–39 (4th Cir. 1998) ("Despite repeated assertions that analysis of his ineffective assistance claim requires an evidentiary hearing, Cardwell has failed to forecast any evidence beyond that already contained in the record, or otherwise to explain how his claim would be advanced by an evidentiary hearing."), *overruled on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000).

Having reviewed the evidence that Bowman attached to his habeas petition and the mitigation evidence presented in state court, the Court agrees with the magistrate judge that the additional evidence would have done little to alter the sentencing profile presented to the jury. *See* ECF No. 75 at 110 (quoting *Strickland*, 466 U.S. 699–700). Contrary to Bowman's assertions and as discussed in detail by the magistrate judge, the record reflects that counsel did not present a weak mitigation case regarding his childhood and background. Such evidence was presented. Additionally, as the PCR court thoroughly explored, and the magistrate judge largely adopted, counsel's investigation was constitutionally adequate. Finally, the statement by PCR counsel that he had no strategic reason for not raising this claim is not sufficient to establish deficient performance, particularly in light of the lack of merit to the underlying ineffective assistance of counsel claim. The Court adopts the magistrate judge's reasoning and conclusion as to Ground 12.

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Bowman therefore cannot rely on *Martinez* to overcome the

procedural default. Accordingly, he is not entitled to relief on Ground 12.

## K. Request for Evidentiary Hearing

For both of the procedurally defaulted grounds, Bowman asks the Court to grant an evidentiary hearing in order for him to more fully develop the factual basis for his claims. That request is denied.

Under the AEDPA, evidentiary hearings on habeas petitions are generally limited. *See Cullen*, 563 U.S. at 181 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). The Supreme Court has not specifically set forth a procedure for determining when evidentiary hearings are permitted or required for the resolution of *Martinez* claims. In general, the AEDPA disallows such hearings, except in limited circumstances:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A)  the claim relies on—
>
> > (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Nevertheless, federal courts have recognized that it is sometimes appropriate to expand the record or to hold an evidentiary hearing in certain situations, such as when determining whether cause and prejudice excuse a petitioner's defaulted claim. *Fielder v. Stevenson*, 2:12-cv-412-JMC, 2013 WL 593657, at *3 (D.S.C. Feb. 14, 2013) (citing *Cristin v. Brennan*, 281 F.3d 404, 416 (3d Cir. 2002)). Additionally, Rules 7 and 8 of the Rules Governing Section 2254 Cases provide for both expansion of the record and for evidentiary hearings.

Here, the magistrate judge exercised his discretion to expand the record and consider information not presented to the state court, including the affidavits described in Ground 12, in determining whether *Martinez* excuses the procedural default of Grounds 11 and 12. Though the magistrate judge expanded the record, for the reasons set forth above, Bowman failed to establish a substantial claim of ineffective assistance of counsel as to each claim. He had an ample opportunity to submit evidence in support of his claims, and he has done so.[11] The magistrate judge and this Court fully considered the evidence he submitted and took all of the new facts to be true, but concluded that he is not entitled to relief for the reasons

---

[11] Bowman implies that he is entitled to an evidentiary hearing because the affidavits that he submitted were not detailed enough. *See* ECF No. 81 at 24 ("[The affidavits are] not exhaustive but [are] representative of what [Bowman] would present at a hearing on the merits of his ineffective assistance of counsel claim . . . ."). It is not procedurally appropriate for a party to submit threadbare affidavits and then use those inadequate affidavits to justify an evidentiary hearing. Here, the affidavits and documentation submitted were sufficient to evaluate his claims. *See Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016) ("Where documentary evidence provides a sufficient basis to decide a petition, the court is within its discretion to deny a full hearing.").

discussed above. Accordingly, his request for an evidentiary hearing as to his unexhausted claims is denied.

## IV. Conclusion

For the reasons stated, the Report, ECF No. 75, is **ACCEPTED**, and Bowman's objections to it, ECF No. 81, are **OVERRULED**. The State's motion for summary judgment, ECF No. 56, is **GRANTED**. Bowman's amended petition for relief pursuant to § 2254, ECF No. 36, is **DENIED**. This action is hereby **DISMISSED**.

The Court has reviewed this petition in accordance with Rule 11 of the Rules Governing Section 2254 Cases. In order for the Court to issue a certificate of appealability, Rule 11 requires that a petitioner satisfy the requirements of 28 U.S.C. § 2253(c)(2), which in turn requires the petitioner to make "a substantial showing of the denial of a constitutional right." The Court concludes, based on the analysis set forth, that Bowman has not made such a showing, and under Rule 11, it is therefore not appropriate to issue a certificate of appealability. However, this is a death penalty case, so review is anticipated and not opposed. Bowman is advised that he is entitled to seek a certificate from the Fourth Circuit Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

                                            *s/ Terry L. Wooten*

                                            Terry L. Wooten

                                            Senior United States District Judge

March 26, 2020
Columbia, South Carolina